UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| DONNA MARIE WILKENS, | : | Case No. 1:11-CV-521 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| PROCTOR & GAMBLE DISABILITY | : | |
| BENEFIT PLAN, | : | |
| | : | |
| Defendant. | : | |

**DECISION AND ENTRY:
(1) GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD (Doc. 46);
(2) DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD (Doc. 47); and
(3) TERMINATING THIS CASE FROM THE DOCKET
UPON ENTRY OF JUDGMENT**

This civil action is before the Court on the parties' cross motions for judgment:

(1) Defendant's motion for judgment on the administrative record (Doc. 46);

(2) Plaintiff's motion for judgment on the administrative record (Doc. 47); and (3) the

parties' responsive memoranda (Docs. 48, 49, 50, and 51).

## I.    PROCEDURAL HISTORY AND BACKGROUND FACTS

Plaintiff initiated this civil action against against the Proctor and Gamble

Disability Benefit Plan ("P&G DBP"), pursuant to the Employee Retirement Income

Security Act ("ERISA"), seeking judicial review of Defendant's decision to terminate

Plaintiff's then existing disability benefits.

Plaintiff worked for Proctor and Gamble ("P&G") from May 1998 until July 2009. (Doc. 46 at 3).  Plaintiff worked as a training administrator for eight years in Baby Care, and then as part of a quality assurance program for the duration of her employment with P&G.  (*Id.* at 3-4).  As an employee of P&G, Plaintiff participated in P&G's disability benefit plan (the "Plan").  (*Id.* at 4).

**A. Terms of the Plan**

Under the Plan, an eligible employee may receive benefit payments under a short-term and long-term disability benefit plan.  (Administrative Record PGDBP-0001-18). To take advantage of the long-term plan (PGDBP-00018), an employee must first be enrolled in the short-term disability plan (PGDBP-00001-17).  A participant with a "total disability" may obtain disability payment benefits.  (PGDBP-00007-11).

> The Plan defines "Total Disability" as follows:
>
> "'Total Disability' means a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the Participant is receiving regular recognized treatments by a qualified medical professional.  Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.  The Trustees reserve the right to determine what is considered as 'regular' and 'recognized treatment.'"

(PGDBP-00003).  The participant bears the burden of proof to establish by objective medical evidence that he or she is either totally or partially disabled, as the terms are defined in the plan.  (PGDBP-00010).  Additionally, each participant has a continuing obligation to prove his or her "total disability" with objective medical evidence.  (*Id.*) "[The Plan] shall not provide benefits…for any period during which a Participant fails to

2

furnish the satisfactory proof that he or she continues to be disabled under the terms of the plan." (PGDBP-00008).

The Board of Trustees of the Plan determines whether benefits are granted and maintains discretionary authority to "interpret the terms of [the] Plan," including "any benefits claims, and to determine eligibility for and entitlement to Plan benefits." (PGDBP-00014). The Board may, as here, establish Reviewing Boards and delegate discretion and authority to make determinations on benefit entitlement. (*Id*.) The P&G Disability Benefit Plan retains discretion to require participants to undergo medical or psychological examinations, and the physicians are required to prepare a detailed report. (PGDBP-00010).[1] Based on this report and other materials submitted by the Participant, the Board must make a decision. (*Id*.)

P&G Disability Benefit Plan uses a third party, Reed Group, Ltd. ("Reed"), as an independent contractor to facilitate the administration of the Plan, including Plaintiff's claims and appeal. (PGDBP-00578-00626). Reed, in turn, retains third parties that are responsible for hiring doctors to perform file reviews and independent medical examinations ("IME"). (*Id*.) P&G Disability Benefit Plan does not have any input into the selection of doctors used to perform file reviews and IMEs. (*Id*.) Reed and the physicians retained to perform file reviews or IMEs provide information and, at times, recommendations as to benefit eligibility, but the Board retains authority to "interpret the

---

[1] "Any Participant receiving disability benefits shall, at the discretion of the Trustees, be required to submit to a physical or psychological examination by a physician designed by the Trustees and paid for from the fund." (PGDBP-00010).

3

terms of this Plan, to determine the facts underlining any benefits claims, and to determine eligibility for and entitlement to Plan benefits." (PGDBP-00014).

**B. Denial of Benefits Based on Administrative Record**

Plaintiff was approved for short-term disability benefits starting March 12, 2007. (Doc. 47 at 1). Plaintiff's diagnosis was Myalgia and Myosotis, Unspecified; and Fibromyositis.[2] (Doc. 18 at 4). Plaintiff continued receiving benefits until June 10 2007, whereupon Plaintiff returned to work. (Doc. 47 at 1). Plaintiff suffered a relapse on October 22, 2007, and P&G DBP found that Plaintiff was totally disabled and was granted benefit payments from October 2007 until March 29, 2008. (*Id.*) Between October 2007 and March 2008, representatives from the Reed Group engaged in multiple communications with Plaintiff and her treating physicians in order to address the lack of objective medical evidence establishing Plaintiff's "total disability." (*See* Doc. 46 at 6).

P&G DBP exercised its rights under the Plan in February and March 2008 to reassess Plaintiff's disability claim. (*Id.*) P&G DBP retained two physicians to perform file reviews of Plaintiff's medical records. (*Id.*) On February 20, 2008, Dr. Michael Farber, Board Certified in Internal Medicine, produced a report stating that "[Plaintiff's] primary limiting factors are related to Fibromyaglia, variant of narcolepsy, and

---

[2] Fibromyositis is a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances -- called also *fibromyalgia syndrome, fibromyalgia. Fibromyositis definition*, Merriam-Webster Medical, http://www.merriam-webster.com/medical/fibromyositis (2013).

depression complicated by ongoing active siginificant stressors." (PDDBP-00149). [3] Dr. Farber added that in Fibromyaglia cases, "the subjective complaints are often out of proportion to the degree of objective findings, which records reflect is the case in this review." (*Id.*) Dr. Farber also noted that "[Plaintiff] is under care of various specialists…and records reflect her symptoms are moderately controlled with medications and participation in clinical therapy." (*Id.*) Dr. Farber concluded that "[Plaintiff] should be able to perform at least full time sedentary work as defined by the [Department of Labor]…There was no objective data to support inability to stand, sit, or perform fine motor and fingering activity frequently." (PGDBP-000151). However, Dr. Farber recommended that Plaintiff return to work over a transitional period, gradually increasing her hours. (*Id.*) On March 3, 2008, Plaintiff's treating physician, Dr. Frias, agreed with Dr. Farber, stating that Plaintiff could return to work as part of a transitional period starting March 29, 2008, pending a psychiatric evaluation. (PGDBP-00198).

On March 21, 2008, Dr. Peter Sugerman, Board Certified in Psychiatry, examined Plaintiff's medical records and concluded that Plaintiff could begin a transition to full time work immediately. (PGDBP-00123-128). [4] In his report, Dr. Sugerman noted that Dr. Wu, Plaintiff's treating psychiatrist, "did not provide documentation that the claimant

---

[3] In conducting his file review, Dr. Farber had an extensive conversation with Plaintiff's treating physician, Dr. Frias, whom Plaintiff had been seeing for over a year. (PGDBP-00149). Dr. Farber also reviewed the notes and correspondence from Plaintiff's other attending physicians, dated 4/2/07 through 1/23/08, including: Virgil D. Wooten, MD, Sleep Medicine; Sri Koneru, MD; and Geraldine Wu, MD, Psychiatrist.

[4] Dr. Sugerman reviewed the medical notes and documents provided by Plaintiff's primary care physician, Dr. Frias, MD; Dr. Koneru, MD; Plaintiff's treating psychiatrist, Dr. Geraldine Wu, MD; and Dr. Farber, MD, internist.

continues to experience severe symptoms of a major depression." (PGDBP-00125). Dr. Sugermen also stated that there was no documentation "that the claimaint's psychiatric condition is preventing her from working" and that there "[were] no significant cognitive or mental status impairments due to depression." (PGDBP-00126). Dr. Sugerman opined that since the claimant may respond negatively to stress, a transitional work schedule with reduced hours could begin immediately. (PGDBP-00126-27).

On March 27, 2008, Reed advised P&G DBP not to pay disability benefits to Plaintiff based on the information provided by Plaintiff's physicians, as well as Dr. Farber's and Dr. Sugerman's reviews, which indicated Plaintiff could return to work on a transitional schedule. (PGDBP-00143-45). On April 8, 2008, the Plan's Claims Administrator for the Corporate Reviewing Board informed the Chairperson of the Corporate Reviewing Board that there was insufficient "objective medical evidence to indicate total disability during the above time period." (PGDBP-00142). On April 10, 2008, Plaintiff was informed that the P&G DBP had "determined that you are no longer totally disabled as defined in the Plan, and benefits have been denied effective March 29, 2008." (PGDBP-00136). The P&G DBP explained that "the current objective medical information provided by your treatment providers is insufficient to determine a total disability as that term is defined by the Plan." (*Id.*) The April 10 letter concluded: "Based on the objective medical information provided, there is no indication that your current condition requires your care in a hospital or confinement to the home. Further, the medical data does not indicate your current conditions are of such severity as to preclude a return to work in a sedentary capacity." (*Id.*)

6

**C.  Denial of Disability Benefits Affirmed on Appeal**

On October 8, 2008, Plaintiff appealed the decision of the Corporate Review Board and attached new documents from her treating physicians.  (PGDBP-00087-118).[5] Based on the Reed Group's recommendation, the Plan agreed to three physician file reviews (performed by Mark Mahowald, MD, Neurologist, Sleep Specialist; Mark Schroeder, MD, Psychiatrist; and Tracey Ann Schmidt, MD, Rheumatologist) (PGDBP-00315-328), and an IME with Dr. James R. Hawkins.

*1. Plaintiff's supplemental medical records*

On April 10, 2008, Dr. Wu stated that Plaintiff "is 100% disabled and should not be working."  (PGDBP-00512).  Then, on May 10, 2008, Dr. Wu noted that Plaintiff has three conditions which limit her cognitive function: Major Depression, recurrent type, Fibromyalgia, and Narcolepsy.  (PGDBP-00515).  Dr. Wu opined that Plaintiff "will need ongoing medication treatment to even maintain a low level of functioning, doing absolutely minimally at her home" and that Plaintiff "is not able to cope with an 8 hour day due to her diminished stamina."  (*Id.*)  Dr. Wu also stated that Plaintiff's GAF score had dropped from a "highest" score of 65 to a "current" score of 55.  (*Id.*)[6]

---

[5] Plaintiff's eight supplemental documents are dated from 4/10/2008-10/5/2008.  (PGDBP-00088).

[6] Dr. Wu gave Plaintiff a GAF score of 65 on both February 28, 2008 and March 28, 2008. (PGDBP-00187, -00179).  Dr. Wu's most recent GAF score of 55 was recorded on May 10, 2008.  (PGDBP-00103).  Within the Global Assessment of Functioning ("GAF") rating system, a person with a GAF score of 65 has "mild symptoms" but is generally functioning "pretty well." *Anderson v. Comm'r of Soc. Sec.*, No. 1:09cv732, 2011 U.S. Dist. LEXIS 9056, at *14, fn. 3 (S.D. Ohio Jan. 4, 2011).  A person with a GAF score of 55 has "moderate symptoms" (*e.g.*, flat effect and circumstantial speech or occasional panic attacks, or moderate difficulty in social or occupational functioning).  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 372-73 (6th Cir. 2013).

On June 1, 2008, Dr. Frias wrote a letter, stating that Plaintiff "has been diagnosed with Fibromyaglia, Sleep Disorder and Depression," and that "despite her best efforts as of today, are still not adequately controlled." (PGDPB-00093). Dr. Frias also noted that she did not believe Plaintiff would be able to perform her current job and "should be considered totally disabled." (*Id.*)

On August 29, 2008, Kathleen Mack, Psy.D., provided a neuropsychological evaluation based on several tests. (PGDBP-104).[7] Dr. Mack's evaluation concluded that Plaintiff's intellectual functioning was "solidly in the average range," but did note some cognitive problems relating to memory and depression. (PGDBP-00111).[8]

Dr. Wu noted the results of Dr. Mack's test and, on September 28, 2008, opined: "Given this type of deficit, it is unlikely that [Plaintiff] can be reintegrated into the work force easily in any kind of job." (PGDBP-00563-564). Dr. Wu also stated that Dr. Mack's test results did "not of course tell us why she has these decificits," but that in his best clinical judgment, "these cognitive deficits are the result of her depression and probably Fibromyalgia." (PGDPB-00564).

---

[7] Dr. Mack based the neuropsychological evaluation on the Wechsler Adult Intelligence Scale III, the Halsted-Reitan Neuropsychological Battery, and the Minnesota Multiphasic Personality Inventory. (PGDBP-00104).

[8] Dr. Mack's evaluation revealed that Plaintiff had significant cognitive impairment in some areas; but that Plaintiff had "intact performance in general intelligence, verbal comprehension, perceptual organization, many aspects of memory besides working memory, attention and concentration in a high structured situation, psychomotor, problem-solving speed and novel problem-solving skills." (PGDBP-00324). Dr. Mack's diagnosis also noted general depression. (PGDBP-00112).

On September 30, 2008, Robert L. Reed, M.D. reported on the results of an MRI: Plaintiff has "one deep right posterior frontal centrum semiovale lesion measured by Dr. Chambers at 7mm, which is bright on the diffusion weighted study. There is no enhancement." (PGDBP-00117). On October 5, 2008, Dr. Wu followed up on Dr. Reed's report, explaining: "Obviously, one cannot say these symptoms are caused by the lesions (or lesions) in her brain…But it is important to bear in mind that there is an increase in symptoms in several domains as her brain reveals structural changes." (PGDBP-00118).

### 2. Physicians' reviews

The three reviewing physicians analyzed the existing medical records on file as well as the new documents supplied by Plaintiff in her appeal. (PGDBP-00315). Each of the three doctors submitted individual reports, which were then compiled into a joint report dated November 14, 2008. (*Id.*)

In the first report, Dr. Mahowald, a sleep specialist, concluded that there was insufficient objective medical information to support Plaintiff's inability to work in any capacity. (PGDBP-00323). This conclusion contradicted the opinion of Dr. Wooten, who had conducted a sleep analysis and had found that Plaintiff was not capable of "achieving sustained function enough to maintain gainful employment." (PGDBP-00544). Dr. Wooten opined that Plaintiff should be "considered totally disabled because of the inability to consistently achieve control of your excessive sleepiness." (PGDBP-00094). Dr. Mahowald stated that, based on Dr. Wooten's study, there "[was] absolutely no evidence, by history or formal sleep studies to support the diagnosis of narcolepsy."

(PGDBP-00316).  In refuting Dr. Wooten's opinion, Dr. Mahowald listed numerous issues he had with Dr. Wooten's report.  (PGDBP-00316-317).

The second report, by Dr. Schroeder, contained an extensive review of the file and the reports of Plaintiff's treating physicians, including Drs. Frias, Wu, Koneru, Mack, Wooten, and Reed.  (PGDBP-00317-321).  Dr. Schroeder concluded that the objective medical information in the claim file did "support [some] psychiatric/cognitive restrictions and limitations, but did not substantiate an inability to perform all work duties.  (PGDBP-00327).  Dr. Schroeder found that Dr. Mack's neuropsychological examination provided the most detailed objective medical evidence.  (PGDBP-00320).  Dr. Schroeder added that "although Dr. Mack's battery of tests assessed functions in many cognitive domains, it is a weakness of this assessment that it did not include a test specifically designed to assess possible exaggeration of symptoms or suboptimal effort."  (PGDBP-00324).

Dr. Schroeder continued, stating that information provided by Dr. Wu generally supported the findings of Dr. Mack.  (PGDBP-00320).  Dr. Wu stated that "[Plaintiff] will need ongoing medication treatment to even maintain a low level of functioning"; and that "she is not able to cope with an 8 hour day due to her diminished capacity."  (PGDBP-00515).  However, Dr. Schroeder noted that "[Dr. Wu] did not provide detailed objective evidence as by the findings of full mental status examinations" to support such opinions.  (PGDBP-00320).

In the third report, Dr. Schimdt concluded that the "file lacks sufficient medical information to support clinical evidence of physical capacity impairment to a full time

10

occupation with sitting 6-8 hours a day, walking and standing 1-2 hours per day, and lifting up to 10 lbs per day with the ability to change positions as needed from a diagnosis of fibromyalgia from 3/29/08 onward." (PGDBP-00325).[9]  Dr. Schmidt noted that the file indicated Plaintiff's reports of pain concerning her fibromyalgia, but that the file "lack[ed] any notes from physical therapy, pain management, or behavioral therapy for pain management," even though "[e]xercise is a common recommendation in the management of fibromyalgia and it is not clear that [Ms. Wilkens] is actively participating in a chronically structured exercise program." (PGDBP-00325).  Dr. Schmidt also noted that Dr. Koneru, a specialist in rheumatology, treated Plaintiff on April 23, 2007.  (*Id.*)  Following treatment, Dr. Koneru noted that Plaintiff could return to work on May 1, 2007.  (*Id.*)

### 3. Independent medical examination

On November 24, 2008, shortly after Drs. Mahowald, Schroeder, and Schmidt submitted their reports, the Board of P&G DBP decided to put Plaintiff on partial disability and requested an IME.[10]  On January 23, 2009, Dr. James R. Hawkins performed a standard psychiatric examination of Plaintiff, reviewed the available medical

---

[9] Dr. Schmidt reviewed and analyzed the information from Drs. Frias, Koneru, Wooten, Wu, and Reed.

[10] The Plan defines "partially disabled" as: a mental or physical condition resulting from an illness or injury because of which the participant is receiving medical treatment and cannot perfrm regular duties of his or her current job, but can perform other useful roles at the same site or other jobs outside the Company.  Thus, a condition of Partial Disability does not necessarily prevent the participant from performing useful tasks, utilizing public or private transportation, or taking part in social or business acivities outside the home.  (PGDBP-00002).

records,[11] and prepared a detailed report dated February 4, 2009 ("Hawkins Report").

(PGDBP-00295).  Concerning Plaintiff's ability to work, Dr. Hawkins noted:

> History, mental status examination, and file review support a
> diagnosis of Dysthymic Disorder which is a chronic low grade
> depressive illness that is not work prohibitive.  As noted, her
> complaints of depressed mood, diminished interest, weight
> change, sleep change, fatigue, and diminished ability to think or
> concentrate have been present for many years and are not work
> prohibitive.  I did not find significant changes in concentration,
> attention, short-term memory, decision making, ADL's or work
> adaptability.

(PGDBP-00304).  Dr. Hawkins concluded that Plaintiff could return to work

immediately, and he suggested that a transitional part-time schedule for four to six weeks

would facilitate full-time return to work.  (PGDBP-00305).

On February 24, 2009, the Board of Trustees notified Plaintiff that her appeal had

been denied by the Corporate Reviewing Board.  (PGDBP-00471).  The Board expressly

acknowledged their receipt and review of additional medical documentation from Drs.

Frias, Wooten, Wu and Mack.  (*Id.*)  The Board agreed with Dr. Hawkins, who had

conducted an IME and concluded that Plaintiff is "able to return to work on a transitional

schedule beginning February 4, 2009.  The transitional schedule recommendation is a

return to work for 4 hours a day, 5 days a week for 4 to 6 weeks."  (*Id.*)  As to objective

evidence of a "Total Disability," the Board stated:

---

[11] Dr. Hawkins reviewed reports and records from both Plaintiff's treating physicians (Drs. Frias, Koneru, Wooten, Mack, Wu, and Reed) and physicians who performed file reviews and an independent psychological examination (Drs. Farber, Sugerman, Schmidt, Mahowald, Schroeder, and Lester).

> "The Trustees have reviewed all of the information provided to them in support of her claim for disability benefits entitlement. The objective medical data provided did not indicate that she required care in a hospital or confinement to the home during this period of time or that she was unable to perform regular duties of her current or other jobs. Based on the records we have, the Trustees have determined that Ms. Wilkens was not disabled as defined by the Plan. Hence, the denial determination was appropriate, and the appeal is denied."

(PGDBP-00472).

Plaintiff's ERISA action stems from the denial of her disability claim. 29 U.S.C. § 1132(a)(1)(b). Plaintiff seeks a determination that she is totally disabled and entitled to recovery of ERISA disability benefits.

## II.    STANDARD OF REVIEW

This Court reviews *de novo* a denial of benefits under an ERISA plan "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Univ. Hosps. v. Emerson Elec. Co.*, 202 F.3d 839, 845 (6th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 103 Ed. 2d 80, 109 S. Ct. 948 (1989)). If an administrator has such discretionary authority, the Court reviews the denial of benefits under the arbitrary and capricious standard. *Firestone*, 489 U.S. at 111.

The arbitrary and capricious standard applies in the present case because P&G's DBP provides that:

> The Trustees have the discretionary authority to interpret the terms of this Plan, to determine the facts underlining any benefits claims, and to determine eligibility for and entitlement to Plan benefits in accordance with terms of this Plan.

(PGDBP-00014). "When a plan administrator has discretionary authority to determine benefits, [the Court] will review a decision to deny benefits under 'the highly deferential arbitrary and capricious standard of review.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)). Furthermore, federal courts have uniformily applied the arbitrary and capricious standard of review when interpreting P&G's DBP. *See*, *e.g., Klem v. Proctor & Gamble Disability Plan*, No. 3:CV-07-284, 2008 U.S. Dist. LEXIS 68372, at *3, 9 (M.D. Pa. Aug. 7, 2008).[12]

Plaintiff argues that the *de novo* level of review should be applied because P&G's DBP does not give a "clear grant of discretion to the administrator to terminate benefits or interpret the plan," as required by the Sixth Circuit. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*). However, the Plan's grant of discretion allows the Trustees to make eligibility determinations under the "terms of the plan," and gives the Trustees the authority to interpret the terms of the Plan. (PGDBP-00014). Thus, the Plan gives the Trustees a clear grant of discretion to determine eligibility, to interpret the plan, and whether to terminate benefits. Furthermore, "Total Disability" is a defined term under the Plan, and its definition includes that "[t]he Trustees reserve the right to determine what is considered as 'regular' and 'recognized treatment.'" (PGDBP-00003). Therefore, the term "Total Disability" is subject to the Trustees interpretation because it

---

[12] *See also, Maciejzak v. Procter & Gamble Co.*, 246 Fed. Appx. 130, 131 (3d Cir. 2007); *Rester v. Procter & Gamble Disability Benefit Plan*, No. 02-3644, 2003 U.S. Dist. LEXIS 22550, at *27 (E.D. La. Dec. 15, 2003); *Mechley v. Procter & Gamble Disability Benefit Plan*, No. C-1-06-538, 2008 U.S. Dist. LEXIS 116306, at *5 (S.D. Ohio July 17, 2008).

is a defined term under the Plan, and the definition of the term itself expressly grants the Trustees interpretive discretion.

Nonetheless, merely because the review is deferential does not mean that the court must rubber-stamp the administrator's decisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). The administrator's decision must be upheld, however, if "the record evidence offers a reasoned explanation for the decision." *Mechley v. Proctor & Gamble*, No. C-1-06-538, 2008 U.S. Dist. LEXIS 116306, at *5 (S.D. Ohio July 17, 2008) (citing *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).

## III.    ANALYSIS

Plaintiff maintains that P&G DBP improperly denied her disability benefits. More specifically, Plaintiff argues that P&G DBP cannot justify terminating her then existing benefits after P&G DBP initially found Plaintiff "totally disabled."

### A. Reversal of Disability Determination

Plaintiff argues that there are only three acceptable reasons this Court should consider when a plan administrator "changes course" and terminates disability benefits: (1) evidence of improvement; (2) a better definition of the participant's medical condition; or (3) any new skills the participant has acquired. (Doc. 47 at 4). However, there is no specific criteria the court must consider when reviewing a plan administrator's decision to deny disability benefits, even after benefits were previously awarded.[13]

---

[13] The case law upon which Plaintiff relies for a finding to the contrary is inapposite. *See, e.g., Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 Fed. Appx. 978, 984 (6th Cir. 2010);

Rather, the ultimate question for the Court is whether the plan administrator, in light of all the evidence, had a "rational basis for concluding that [Plaintiff] was not disabled at the time of the new decision;" and since "disabled," in this case, refers to any occupation, "any number of factors could be germane to such a determination." *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 Fed. Appx. 978, 984 (6th Cir. 2010).[14]

Plaintiff cites *Neaton v. Hartford Life Ins. Co.*, for the proposition that her disability should be presumed and it is P&G DBP's burden to prove otherwise. 2013 U.S. App. LEXIS 5814, No. 11-6061, at *36 (6th Cir. Mar. 21, 2013) (a plan participant "remains presumptively entitled to the continuation of his or her previously awarded long-term disability benefits"). However, Plaintiff's citation to *Neaton* relates to the "question of remedy" not whether the plan administrator acted arbitrarily and capriciously by denying disability benefits. In *Neaton*, the plan administrator relied on a single file review which ignored the vast body of medical evidence. *Id*. at 27. Here, P&G DBP relied on five independent file reviews and an IME, each of which provided reasoned analysis of the medical evidence and consistently concluded that Plaintiff was not "totally disabled" as defined in the Plan. Under the arbitrary and capricious standard of review, the Court "must accept a plan administrator's rational interpretation of the

---

*Kramer v. Paul Revere Life Ins. Co*., 571 F.3d 499 (6th Cir. 2009); *McCollum v. Life Ins. Co. of North America*, 495 Fed. Appx. 694 (6th Cir. Aug. 21, 2012); *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501. 503 (6th Cir. 2005).

[14] The three criteria which Plaintiff argues comprise the exclusive list of reasons for terminating benefits are actually just three examples given by the court to show the wide variety of acceptable criteria. *Morris*, 399 Fed. Appx. at 984.

plan, even in the face of an equally rational interpretation by the participants."  *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005).

Moreover, the Plan explicitly states that in order to receive benefits, a participant must provide objective medical evidence proving they are disabled.  (PGDBP-00008-10).[15]  Indeed, the record shows that Plaintiff was made aware on multiple occasions that her file lacked objective medical evidence to support a disability claim.[16]  Therefore, the crux of the issue before the Court is whether P&G DBP's determination that Plaintiff was no longer disabled was arbitrary and capricious.

**B. Lack of Objective Medical Evidence**

Plaintiff's argument rests on two interrelated principles: (1) P&G DBP improperly disregarded objective medical evidence which supported her benefits claim; and (2) the file reviews and IME which P&G DBP relied on were flawed and should be discounted.

*1. Drs. Farber and Sugerman's reports*

P&G DBP based its April 8, 2008 determination that Plaintiff was not "disabled" on the reports of Dr. Farber and Dr. Sugerman who conducted independent file reviews of Plaintiff's medical history.  As discussed *supra*, both doctors conducted a thorough review of the evidence and concluded there was not sufficient objective evidence of

---

[15] "It is the Participant's burden to establish by objective medical evidence that he or she is either totally or partially disabled, as the terms are defined in the Plan."  (PGDBP-00010). "This Plan shall not provide benefits . . . for any period during which a Participant fails to furnish the satisfactory proof that he or she continues to be disabled under the terms of the plan."  (PGDBP-00008).

[16] *See, e.g.*, January 18, 2008 Absence Report (PGDBP-00054); January 21, 2008 Absence Report  (PGDBP-00054); January 22, 2008 Absence Report (PGDBP-00056) (generally informing plaintiff that her physicians needed to submit objective and physical findings indicating need for total disability).

Plaintiff's disability.  Plaintiff argues that Dr. Farber's report (PGDBP-00148-52) is flawed because it did not consider Plaintiff "as a whole."  *Kalish v. Liberty Mut.*, 419 F.3d 501, 503 (6th Cir. 2005) (following *Calvert v. Firstar*, 409 F.3d 286, 297 (6th Cir. 2005).[17]  However, the fact that Dr. Farber limited his review to internal medicine (PGDBP-00150) is insufficient grounds to discount the opinion, given the fact that the Board considered the opinions of two physicians who, *in toto*, considered all of Plaintiff's alleged medical impairments.

Next, Plaintiff relies on *McDonald v. Western-Southern Life Ins., Co.* for the proposition that the Court should not consider Dr. Sugerman's "corrected" report.  347 F.3d at 165 (holding that the second report should be discounted because it was "significantly different than his initial report without any justification for the change, other than the telephone contact from Western-Southern").[18]  This argument lacks merit primarily because, unlike in *McDonald*, P&G DBP never received the original report.  As third-party administrator of the Plan, Reed is responsible for hiring doctors to perform the file reviews.  The doctors' reports are collected and reviewed by Reed before being sent

---

[17] In *Kalish*, the plaintiff suffered from heart disease and depression.  419 F.3d at 503.  Liberty Mutual discontinued the plaintiff's disability benefits based on a single peer review in which the doctor completely ignored the plaintiff's depression and the connection between plaintiff's heart condition and his mental ailments.  *Id.* at 510.

[18] In *McDonald*, Western–Southern terminated the plaintiff's benefits after the plan administrator's psychiatrist drafted an initial report which stated that the plaintiff "may be able to return to work."  *Id.* at 164.  The plaintiff filed an appeal, including supplemental affadavits supporting her disability claim.  *Id.* at 165.  After a phone conversation in which numerous Western-Southern executives questioned the reviewing psychiatrists "hesitancy" to state that the plaintiff was able to return to work, the psychiatrist submitted an addendum which stated: "McDonald is not suffering from any [medical condition] that is severe enough to prevent him from returning to work."  *Id.*

18

to P&G DBP.  After receiving Dr. Sugerman's original report, Reed sent it back so that

Dr. Sugerman could "review [his] response to question number 6" because "there [was]

either a typo or need for further clarification."  (PGDBP-00064).  P&G DBP never

received the original report or spoke to Dr. Sugerman about it.  There is nothing to

suggest Reed influenced any substantive changes to the report.  Thus, there is no

indication of improper influence between P&G DBP and Dr. Sugerman.

Drs. Farber and Sugerman focused their reports on their respective areas of

expertise, but the cumulative conclusion from both reports sufficiently encompassed all

of Plaintiff's medical conditions.  Furthermore, Reed submitted a single

"Recommendation Report" to P&G DBP which was based on all the medical evidence.

(PGDBP-00140-141).  Thus, P&G DBP did not fail to consider Plaintiff's medical

condition "as a whole."  *Calvert*, 409 F.3d 286, 295.

### 2. Objective medical evidence

Much of the medical evidence on which Plaintiff relies is not actually objective,

nor is it relevant to determining disability.  The Sixth Circuit identified certain "external

indicators" which the courts may use as "objective evidence" of pain.  *Brooking v.*

*Hartford*, 167 Fed. Appx. 544, 549 (6th Cir. 2006). [19]  More specifically, the process of

diagnosing fibromyalgia includes testing for focal points for tenderness.  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007).  However, the Plan requires

---

[19] Those indicators include facial grimacing, deviations in posture and movement patterns,
frequent adjustments while maintaining a seated position, and an antalgic gait (limp).  *Brooking*,
167 Fed. Appx. at 549.

objective medical evidence that a participant is disabled.[20]  (PGDBP-00008).  Much of the evidence Plaintiff indentifies concerns whether she felt pain or was suffering from fibromyalgia, not whether Plaintiff was disabled by the fibromyalgia.  (Doc. 51 at 12).  *See Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 502 (6th Cir. 2008) ("The critical question…is not whether [the plaintiff] does or does not have fibromyalgia…but whether she is disabled under the plan.").

Additionally, many of the statements which Plaintiff proffers as objective medical evidence are self-reported, subjective complaints of pain or limitation.  For example, Plaintiff "stated that she is not walking well, having balance issues" (PGDBP-00050), and "her fibromyalgia cause[s] heavy pains in her arms and legs…her arms are so heavy…she was unable to drive."  (PGDBP-00052; Doc. 47 at 6).  While these statements are consistent with the majority of reports by Plaintiff's treating physicians, they do not constitute objective medical evidence.  *See Yeager*, 88 F.3d at 382 (holding that "absent any definite anatomic explanation of plaintiff's symptoms, we cannot find that the adminstrator's decision to deny benefits was arbitrary and capricious.").  Thus, having sufficient objective medical evidence to support a diagnosis of fibromyalgia is not enough, on its own, to meet the Plan's definition of "totally disabled."  (PGDBP-00003).

---

[20] While diagnoses of fibromyaglia are often based on subjective complaints of pain, a plan administrator may still reasonably require objective evidence that the fibromyalgia is disabling. *Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 500 (6th Cir. 2008) ("A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective.  But objective evidence of disability due to fibromyalgia can be furnished by a claimant without the same level of difficulty.")

### 3. File reviews

Plaintiff also incorrectly interprets the Sixth Circuit's position on an admin-

istrator's use of file reviews to reject the opinion of treating doctors.  (Doc. 47 at 9)

(citing *Calvert*, 409 F.3d at 294 for the proposition that "a plan administrator may not

arbitrarily disregard the medical evidence proferred by the claimant…").

> "Under ERISA, plan administrators are not required to accord
> special deference to the opinions of treating physicians.
> Moreover, ERISA does not impose a heightened burden of
> explanation on administrators when they reject a treating
> physician's opinion. Reliance on other physicians is reasonable
> so long as the administrator does not totally ignore the treating
> physician's opinions."

*Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010) (following

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).[21]  Thus, while plan

administrators may not arbitrarily disregard Plaintiff's medical evidence, they do not

need to give it any special weight.

Plaintiff argues that the file reviews of Drs. Mahowald, Schroeder, and Schmidt

should be treated with skepticism because they improperly reject the opinions of

Plaintiff's treating doctors.  (Doc. 47 at 9).  While the three reports do contradict the

statements of Plaintiff's treating physicians, the reviewing doctors offered reasoned

explanations to support their conclusions.  (PGDBP-00315-328).  For example, Dr.

---

[21]  In *Black and Decker*, the Supreme Court held that while plan administrators "may not
arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating
physician…Courts have no warrant to require administrators automatically to accord special
weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a
discrete burden of explanation when they credit reliable evidence that conflicts with a treating
physician's evaluation."  538 U.S. at 834.

Mahowald pointed out several deficiencies with Dr. Wooten's findings which undermined its credibility.[22]  Similarly, both Drs. Schroeder and Schmidt found that while there was objective evidence of Plaintiff's conditions, there was not enough to declare her "totally disabled."  (PGDBP-00327).

### 4. Dr. Hawkins' IME

First, Plaintiff claims Dr. Hawkins' IME should not be considered by the Court because Dr. Hawkins did not address narcolepsy and fibromyalgia.  (PGDBP-00302).  This argument is analogous to Plaintiff's earlier allegations concerning Drs. Farber and Sugerman, and it is similarly flawed.  Dr. Hawkins' report clearly shows that he acknowleged Plaintiff's various medical conditions but chose to limit his discussion to his field of expertise, "address[ing] psychiatric issues only."  (PGDBP-00295-306).  Although Dr. Hawkins focused on psychiatric issues, his findings are not arbitrary because his determination was supported by five other doctors, each specializing in areas which directly addressed Plaintiff's other medical conditions.  (PGDBP-00304).

---

[22] After reviewing Dr. Wooten's records, Dr. Mahowald found that Dr. Wooten's diagnosis, dated May 9, 2008, was based on a multiple sleep latency test (MLST) "which revealed a mean sleep latency of 7.6 minutes with no REM sleep occurring on any nap."  (PGDBP-00316).  However, "there [was] no information as to the quality or quantity of sleep the night prior to the MSLT" and that the only sleep study data available was a single polysomnopraphic (PSG) study dated November 18, 2007.  (*Id.*)  Dr. Mahowald added that "the finding of relatively less than average REM sleep percentage on a single PSG is of absolutely no clinical relevance" and cannot be correlated with daytime complaint.  (*Id.* at 317).

Second, Plaintiff argues that Dr. Hawkins' report contained substantial innacuracies. (Doc. 47 at 13-15). However, Plaintiff fails to demonstrate how these alleged inaccuracies are significant or, in fact, inaccuracies at all.[23]

Third, Plaintiff argues that the Court should discount Dr. Hawkins' report because he made improper credibility assessments. *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547 (6th Cir. 2008). However, *Bennett* is readily distinguished. Unlike Dr. Hawkins, the reviewing doctor in *Bennett* never examined the plaintiff in person. *Id.* at 555. Despite only reviewing the work of the treating physicians, the doctor in *Bennett* described the plaintiff as "'exaggerating' and 'embellishing' in her test performance." *Id.* In contrast, Dr. Hawkins noted that plaintiff had been diagnosed with "borderline narcolepsy" but that this was "not supported by the file evidence." (PGDBP-00298). The "borderline narcolepsy" diagnosis is found in a note from Dr. Wu which stated that, in 2003, Dr. Helm "suggested a sleep study and [Plaintiff] was given the Dx of Borderline Narcolepsy." (PGDBP-00192). However, the record does not contain any reports or notes from Dr. Helm. Similarly, Dr. Wooten could not make a "firm diagnosis of narcolepsy." (PGDBP-00094). Thus, Dr. Hawkins' comment was simply stating a fact, not making a credibility assessment.

---

[23] For example, Dr. Hawkins noted "Dr. Wu has assigned a GAF of 65." (PGDBP-00302). Plaintiff correctly points out that Dr. Wu had assigned a "current" GAF score of 55 on May 10, 2008 (PGDBP-00515). While Dr. Hawkins' recitation of Plaintiff's GAF was not inaccurate, it was perhaps imprecise with respect to the date of that GAF score. Dr. Wu had, in fact, assigned Plaintiff a GAF score of 65 on two separate occasions, most recently on March 28, 2008. *See* Footnote 6. Furthermore, if the recency of the GAF is controlling, then the Court should give more weight to Dr. Hawkins' GAF score of 65-70, which he assigned to Plaintiff in January 2009. (PGDBP-00303). Additionally, while Dr. Hawkins' findings were not as detailed as the report given by Dr. Wooten, they were not contradictory. (PGDBP-00295).

Finally, Plaintiff contends that Dr. Hawkins "bootstrapped" Dr. Mack's uncritical report to make a critical attack on Plaintiff's credibility.[24]  While Dr. Hawkins interpreted Dr. Mack's results differently, there is no evidence of a negative credibility assessment. (PGDBP-00296).[25]  Dr. Hawkins' interpretation is well accepted in the medical field and was based on an extensive review of the medical records and first hand observations of the Plaintiff.  (*Id.*)

## IV.    CONCLUSION

Upon a careful review of the administrative record, the Court finds that Defendant's decision to deny Plaintiff disability benefits was not arbitrary and capricious. "The ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).  Here, P&G DBP had a rational basis for concluding Plaintiff was not disabled.  *Morris*, 399 Fed. Appx. at 984.  Under the Plan,

---

[24] Dr. Mack conducted the Minnesota Multiphasic Personality Inventory-2 test (MMPI-2), which revealed an elevated F scale, thus "a questionably valid profile."  Dr. Mack "attributed this to emotional distress rather than symptom magnification" (PGDBP-00298) and determined that the profile was likely valid (PGDBP-0110).

The F scale is one of several validity measurements of the MMPI-2.  James. N. Butcher, *et al*., Development and Use of the MMPI (1990), *reprinted* The Oxford Handbook of Personality Assessment 254-55 (James N. Butcher ed., 2009).  An elevated F scale indicates random responses or a fake-bad response bias on the part of the test taker.  (*Id.* at 255).  However, an elevated F scale is open to multiple interpretations and does not necessarily mean the test subject faked answers.  (*Id.*)

[25] Dr. Hawkins' stated only that the results were "questionably valid" (PGDBP-00296), which is neither an attack on Plaintiff's credibility nor radically dissimilar to Dr. Mack's interpretation that the results were "likely valid."  (PGDBP-00110).

Plaintiff had a continuing obligation to provide sufficient objective medical evidence to show that she was "totally disabled" and failed to do so.  (PGDBP-00010).  In determining there was insufficient objective medical evidence, P&G DBP considered Plaintiff's medical records, the file reviews of *five* independent doctors, and an independent medical examination.

Accordingly:

1. Defendant's motion for judgment on the administrative record (Doc. 46) is **GRANTED**;

2. Plaintiff's motion for judgment on the administrative record (Doc. 47) is **DENIED**; and

3. The Clerk shall enter judgment for Defendant and against Plaintiff, whereupon this case shall be **CLOSED**.

**IT IS SO ORDERED.**

Date:  8/2/13                                         */s/ Timothy S. Black*
                                                     Timothy S. Black
                                                     United States District Judge